Filed 6/28/22 In re K.F. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re K.F., a Person Coming Under the Juvenile Court Law. | |
| STANISLAUS COUNTY COMMUNITY SERVICES AGENCY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>MARIO F.,<br><br>Defendant and Appellant. | F083814<br><br>(Super. Ct. No. JVDP-20-000195)<br><br>**OPINION** |

## THE COURT[*]

APPEAL from an order of the Superior Court of Stanislaus County. Ann Q. Ameral, Judge.

Linda J. Conrad, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Boze, County Counsel, and Angela J. Cobb, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

[*]       Before Detjen, Acting P. J., Meehan, J. and Snauffer, J.

Appellant Mario F. (father) is the biological father of K.F. (the child), who is the subject of a dependency case. Father challenges the juvenile court's orders terminating his parental rights at a Welfare and Institutions Code[1] section 366.26 hearing. Father's sole claim is that the juvenile court failed to ensure compliance with the inquiry and notice provisions of the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.) (ICWA). We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

On July 24, 2020, the child was taken into protective custody, pursuant to a warrant, by Alameda County Social Services (ACSS). ACSS filed a petition alleging the child was at substantial risk of suffering serious physical harm under section 300, subdivision (b) as a result of mother's alcohol abuse and domestic violence between mother and father. Father's whereabouts were unknown at the time of the child's removal, and he was identified as an alleged father.

The child was placed with the maternal grandmother pursuant to an emergency resource family approval. Father had prior child welfare case history as a minor, and Stanislaus County had responded to two separate referrals for alleged emotional abuse and general neglect by father towards three of his other children. Mother informed the emergency response social worker from ACSS that the family had no known Indian ancestry.

At the detention hearing held on July 29, 2020, mother was present via phone and appointed counsel while father did not appear. While under oath, mother indicated that she was in contact with father's relatives and she would provide information on her attempts to contact them to her attorney. In reference to father's relatives, mother

---

[1] All further statutory references are to the Welfare and Institutions Code.

[2] The sole issue on appeal concerns ICWA; therefore, we primarily restrict our facts to those bearing on that issue.

2.

claimed, "He doesn't really mess with them. It's a very messy situation …." Mother also claimed she had Indian ancestry through her great-grandmother with a tribe in Arizona that her great-grandparents left. Mother denied having any knowledge that father had Indian ancestry. The Alameda County Juvenile Court ordered that ACSS retain temporary custody pending disposition, and it set a contested hearing on August 19, 2020.

On August 26, 2020, ACSS sent formal notice, pursuant to ICWA, to the Bureau of Indian Affairs (BIA) and three bands of the Cherokee tribe regarding mother's claim of Indian ancestry. Father was listed as the child's biological and legal father on the third and eighth pages of the notice with no paternal relatives identified. The notice also identified the child's maternal grandmother and maternal great-grandfather as family members with potential Indian ancestry through the Cherokee tribe.

In the report prepared for a continued hearing on jurisdiction and disposition, ACSS recommended the juvenile court find the allegations of the petition true and order reunification services to mother. Father's whereabouts remained unknown, and ACSS requested that the case be transferred to Stanislaus County where mother resided. At the continued jurisdiction and disposition hearing on September 10, 2020, the Alameda County Juvenile Court found that the child came within the provisions of section 300, subdivisions (b) and (g), ordered reunification services to mother, denied reunification services to father based upon his status as an alleged father, and transferred the matter to Stanislaus County. There were no findings made regarding ICWA, and the Alameda County Juvenile Court requested that the Stanislaus County Juvenile Court (juvenile court) be alerted to the need to follow up on ICWA.

At the transfer-in hearing held on October 1, 2020, the juvenile court accepted the case and set a transfer-in review hearing for October 29, 2020. The Stanislaus County Community Services Agency (agency) prepared a report for acceptance of the case, which indicated that father was not in contact with the agency or able to be located.

3.

Mother denied having contact information for father, but the child believed she heard father in the background during a phone visit with mother. The agency indicated that it would complete and send any new information regarding ICWA that may be necessary. On September 30, 2020, mother filed a Parental Notification of Indian Status form (ICWA-020) reiterating her belief that she may have Indian ancestry though the Cherokee tribe.

On February 10, 2021, the agency mailed an additional formal notice, pursuant to ICWA, to the BIA and three bands of the Cherokee tribe. The notice identified father as the "alleged biological father" with unknown tribal ancestry. The child's maternal grandparents and great-grandparents were listed as individuals with possible Cherokee ancestry. The child's maternal great-grandmother was also listed as a great-great-grandmother under "other relative information" along with another maternal relative. The child's paternal grandparents and great-great-grandfather were identified with names, dates of birth, and unknown tribal ancestry. The paternal great-great-grandfather's last name was spelled differently from the paternal grandfather's last name. The great-great-grandfather and grandfather's dates of birth shared the same last two digits.

The agency's report prepared for the six-month review hearing indicated that father was located in custody after a domestic violence incident with mother. Father was appointed counsel and genetic testing was ordered during his first appearance at a continued six-month review hearing in March 2021. Father did not know if he had any Indian ancestry, and he claimed his deceased mother once told him that he might have Indian ancestry. When asked if there was anyone the juvenile court could ask about possible Indian ancestry, father stated, "Nope. Everybody is dead." The juvenile court found there was no reason to believe that ICWA was applicable after concluding its inquiry of father. Mother's reunification services were eventually continued with a 12-month review hearing set for September 2, 2021.

4.

On August 6, 2021, the juvenile court found ICWA was not applicable based upon the agency's motion, which included responses from each of the Cherokee tribes indicating the child was not an Indian child. In the report for the 12-month review hearing, the agency recommended that mother's reunification services be terminated and a section 366.26 hearing be set. The genetic testing revealed father was the child's biological father, and father was transferred to custody in state prison. The child remained placed with the maternal grandmother who was open to providing a permanent plan of adoption or guardianship. According to the child's Court Appointed Special Advocate (CASA), the child wanted a restraining order preventing contact between her and father because she was terrified of father.

On September 2, 2021, the juvenile court found father was the biological father of the child based upon the genetic testing results, and mother requested a contested hearing on the 12-month review. At the continued 12-month review hearing held on September 13, 2021, the juvenile court terminated mother's reunification services and set a section 366.26 hearing for January 11, 2022. The report for the section 366.26 hearing recommended that parental rights for mother and father be terminated and a plan of adoption be selected. The child's maternal grandmother was identified as the prospective adoptive parent. The juvenile court's previous finding from August 6, 2021, that ICWA was not applicable was noted with no new information provided.

Mother, father, and the child were all present for the section 366.26 hearing. Father's counsel entered an objection to the recommendation, and the juvenile court found the child was likely to be adopted and terminated the parental rights of mother and father.

## DISCUSSION

Father contends the juvenile court's finding that ICWA did not apply was not supported by sufficient evidence because the agency failed to conduct an adequate inquiry of father's claim of unknown Indian ancestry. Father also argues the notice

contained inaccurate information and an updated notice was required based upon father's claim of unknown Indian ancestry.

### A.   *Legal Principles*

ICWA reflects a congressional determination to protect Indian children and to promote the stability and security of Indian tribes and families by establishing minimum federal standards that a state court, except in emergencies, must follow before removing an Indian child from his or her family. (25 U.S.C. § 1902; see *In re Isaiah W.* (2016) 1 Cal.5th 1, 7–8.) In any "proceeding for the foster care placement of, or termination of parental rights to, an Indian child, the Indian custodian of the child and the Indian child's tribe … have a right to intervene" (25 U.S.C. § 1911(c)), and may petition the court to invalidate any foster care placement of an Indian child made in violation of ICWA (25 U.S.C. § 1914; see § 224.2, subd. (e)). An "Indian child" is defined in ICWA as an unmarried individual under 18 years of age who is either (1) a member of a federally recognized Indian tribe, or (2) is eligible for membership in a federally recognized tribe and is the biological child of a member of a federally recognized tribe. (25 U.S.C. § 1903(4) & (8); see § 224.1, subd. (a) [adopting federal definitions].)

In every dependency proceeding, the agency and the juvenile court have an "affirmative and continuing duty to inquire whether a child is or may be an Indian child .…" (Cal. Rules of Court, rule 5.481(a); see also § 224.2, subd. (a); *In re W.B.* (2012) 55 Cal.4th 30, 53; *In re Gabriel G.* (2012) 206 Cal.App.4th 1160, 1165.) The continuing duty to inquire whether a child is or may be an Indian child "can be divided into three phases: the initial duty to inquire, the duty of further inquiry, and the duty to provide formal ICWA notice." (*In re D.F.* (2020) 55 Cal.App.5th 558, 566 (*D.F.*).)

The initial duty to inquire arises at the referral stage when the reporting party is asked whether it has "any information that the child may be an Indian child." (§ 224.2, subd. (a).) Once a child is received into temporary custody, the initial duty to inquire includes asking the child, parents, legal guardian, extended family members, and others

who have an interest in the child whether the child is, or may be, an Indian child. (§§ 224.2, subd. (b), 306, subd. (b).) The juvenile court has a duty at the first appearance of each parent to ask whether he or she "knows or has reason to know that the child is an Indian child." (§ 224.2, subd. (c).) The court must also require each parent to complete an ICWA-020 form. (Cal. Rules of Court, rule 5.481(a)(2)(C).)

Next, a duty of further inquiry arises when the social service agency or the juvenile court has "reason to believe" the proceedings involve an Indian child but "does not have sufficient information to determine that there is reason to know that the child is an Indian child." (§ 224.2, subd. (e).) As recently clarified by the Legislature, a "reason to believe" exists when the court or the social service agency "has information suggesting that either the parent of the child or the child is a member or may be eligible for membership in an Indian tribe." (*Id.* subd. (e)(1).)

If there is a reason to believe an Indian child is involved, the court or the social service agency "shall make further inquiry regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable." (§ 224.2, subd. (e); *In re Y.W.* (2021) 70 Cal.App.5th 542, 552.) Further inquiry includes, but is not limited to, "[i]nterviewing the parents, Indian custodian, and extended family members," and contacting the BIA, the State Department of Social Services, and the tribes and any other person who may have information. (§ 224.2, subd. (e)(2)(A)–(C).)

The final duty component arises when the court or agency has "reason to know" the child is an Indian child. (*D.F.*, *supra*, 55 Cal.App.5th at p. 567.) A "reason to know" exists if one of the following circumstances is present: "(1) A person having an interest in the child … informs the court that the child is an Indian child[;] [¶] (2) The residence … of the child [or] the child's parents … is on a reservation or in an Alaska Native village[;] [¶] (3) Any participant in the proceeding … informs the court that it has discovered information indicating that the child is an Indian child[;] [¶] (4) The child … gives the court reason to know that the child is an Indian child[;] [¶] (5) The court is

7.

informed that the child is or has been a ward of a tribal court[; or] [¶] (6) The court is informed that either parent or the child possess[es] an identification card indicating membership or citizenship in an Indian tribe." (§ 224.2, subd. (d).)

"The duty to provide notice is narrower than the duty of inquiry. Although the duty of inquiry applies to every 'child for whom a petition under Section 300, 601, or 602 may be or has been filed' [citation], and the duty of further inquiry applies when there is a 'reason to believe that an Indian child is involved in a proceeding' [citation], the duty to provide notice to Indian tribes applies only when one knows or has a 'reason to know … an Indian child is involved,' and only 'for hearings that may culminate in an order for foster care placement, termination of parental rights, preadoptive placement, or adoptive placement.' " (*In re Austin J.* (2020) 47 Cal.App.5th 870, 884.)

"Once [the agency] or the juvenile court has a reason to know an Indian child is involved, notice pursuant to ICWA must be sent to the pertinent tribe(s) via registered or certified mail.… [¶] … [¶] It is this 'notice requirement, which … enables a tribe to determine whether the child is an Indian child and, if so, whether to intervene in or exercise jurisdiction over the proceeding.' " (*D.F.*, *supra*, 55 Cal.App.5th at p. 568, italics omitted.)

An Indian tribe's determination that a child is or is not a member of, or eligible for membership in, that tribe is conclusive. Information that the child is not enrolled or is not eligible for enrollment in the tribe is not determinative unless the tribe also confirms in writing that enrollment is a prerequisite for membership under tribal law or custom. (§ 224.2, subd. (h).)

If the juvenile court makes a finding that proper and adequate further inquiry and due diligence have been conducted and there is no reason to know whether the child is an Indian child, the court may make a finding that ICWA does not apply, subject to reversal if the court subsequently receives information providing reason to believe the child is an

8.

Indian child. If the court receives such information, it must direct the social worker or probation officer to conduct further inquiry. (§ 224.2, subd. (i)(2).)

**B.** *Standard of Review*

A juvenile court's finding that ICWA is inapplicable is reviewed under the substantial evidence standard. (*In re Rebecca R.* (2006) 143 Cal.App.4th 1426, 1430.) Thus, we must uphold the juvenile court's orders and findings if any substantial evidence, contradicted or uncontradicted, supports them, and we must indulge all legitimate inferences in favor of affirmance. (*In re John V.* (1992) 5 Cal.App.4th 1201, 1212.)

**C.** *Analysis*

In the present case, father was not present during the child's removal, and his whereabouts remained unknown for the first nine months of the dependency matter. Father informed the juvenile court that he did not know if he had any Indian ancestry during his first appearance in the matter at a six-month review hearing. However, he did claim that his deceased mother once told him that he might have Indian ancestry. In response to the juvenile court's inquiry into whether any other persons had information about any possible Indian ancestry in his family, father merely responded, "Nope. Everybody is dead." Despite the lack of evidence in the record that paternal relatives were available to the agency during its initial inquiry, father now suggests that the initial inquiry was inadequate absent specific documentation that the agency asked father for information about his living and deceased relatives, attempted to locate or interview paternal relatives regarding potential Indian ancestry, or reviewed information from father's child welfare history as a minor.

Father cites to the case of *In re Antonio R.* (2022) 76 Cal.App.5th 421, 430 (*Antonio R.*), which expressly held it was prejudicial error for the agency not to inquire of extended family members. However, in that case the appellate court found prejudicial error because there were available or readily available extended family members that the agency failed to inquire of. (*Id.* at p. 431)

9.

In *Antonio R.*, the juvenile court found ICWA did not apply based on mother, father, and paternal great-grandmother's denials of Indian ancestry, but there were still known and available extended family members that the agency could have contacted to inquire about possible Indian ancestry. (*Antonio R.*, *supra*, 76 Cal.App.5th at p. 431.) Specifically, the maternal grandmother was interviewed by the agency prior to the detention hearing, the child was later placed with the maternal grandmother, and multiple maternal relatives were present at the disposition hearing. (*Ibid.*) None of those identified and readily available relatives were questioned regarding potential Indian ancestry. (*Ibid.*) On appeal, the court found the error prejudicial. (*Id.* at p. 426.)

*Antonio R.* is distinguishable from the present case because there is no evidence in the record that paternal relatives were present during the child's initial removal, attended hearings in the matter, or were even considered for placement of the child. In fact, father explicitly stated that any of his relatives having information on possible Indian ancestry were deceased. To the extent that father also argues that these alleged deficiencies extend to a required further inquiry, we reject such a contention. (See *In re D.S.* (2020) 46 Cal. App. 5th 1041, 1053 ["no further inquiry was needed because there was no further information of value to obtain"].) Although a review of father's juvenile records as a child could have contained information about possible Indian ancestry, the lack of documentation that such a step was taken does not render the agency's inquiry inadequate under the circumstances.

Father's reliance upon *In re I.F.* (2022) 77 Cal.App.5th 152, 164 is similarly unpersuasive. In that case, mother claimed she had been told by the maternal grandfather (her father) that she had Indian ancestry through the child's maternal great-grandfather, and the child's maternal grandfather confirmed that his father told him the family had Indian ancestry in Minnesota. (*Id.* at pp. 157, 159–160.) Under these circumstances, the appellate court found that the duty of further inquiry was triggered based upon a "reason to believe" the children were Indian children. (*Id.* at p. 164.) Therefore, upon remand

10.

the department was required to gather biological information related to the maternal great-grandfather and provide the information to the BIA and the federally recognized tribes in Minnesota. (*Id.* at p. 166.)

Here, there is no evidence that any living relatives with knowledge of father's possible Indian ancestry were available for the agency to interview. Father's claim that mother was in contact with father's relatives and able to provide information to the agency is unavailing. Mother agreed to provide any information on her attempts to contact relatives to her attorney. Without such information being placed on the record, we can reasonably infer that she was unable to provide information on relatives who would shed light on father's unknown claim of Indian ancestry. (See *In re I.J.* (2013) 56 Cal.4th 766, 773 ["we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations"].) Furthermore, the agency did provide formal notice to the BIA with the biographical information it was able to obtain from father. This differs significantly from *In re I.F.*, *supra*, 77 Cal.App.5th 152 where the parent was challenging the child welfare agency's failure to obtain biological information from a relative who was available and already interviewed by social workers.

While it is well established that the "duty to develop information concerning whether a child is an Indian child rests with the court and the [agency], not the parents or members of the parents' families" (*Antonio R.*, *supra*, 76 Cal.App.5th at p. 430), the court and agency often cannot satisfy this duty without participation from the parents. Given father's express statement that all persons that had information about his family's possible Indian ancestry were deceased, the agency had no additional leads to pursue.

In the present case, the agency had no duty to locate or interview paternal relatives without knowledge that available paternal relatives had meaningful information regarding claimed Indian ancestry. (See, e.g., *In re Michael V.* (2016) 3 Cal.App.5th 225, 233 [Department made no effort to locate and interview children's maternal grandmother

11.

"even though it was she who reportedly had the direct link to a tribe"].) "ICWA does not obligate the court or [agency] 'to cast about' for investigative leads. [Citation.] There is no need for further inquiry if no one has offered information that would give the court or [agency] reason to believe that a child might be an Indian child. This includes circumstances where parents 'fail[] to provide any information requiring followup' [citations], or if the persons who might have additional information are deceased [citation], or refuse to talk to [the agency]." (*In re A.M.* (2020) 47 Cal.App.5th 303, 323.) "[T]he obligation is only one of inquiry and not an absolute duty to ascertain or refute Native American ancestry." (*In re Antoinette S.* (2002) 104 Cal.App.4th 1401, 1413.)

Finally, father also contends that the agency had reason to know the child was an Indian child such that its failure to send an updated notice after he was elevated to biological father resulted in reversible error. He also argues that the agency's notice listed an incorrect name and date of birth for the child's paternal great-great-grandfather. Even if notice was required, the discrepancies alleged by father did not render the notice inadequate. The BIA had previously received a notice regarding the child indicating father was the biological and legal father, and father's claim that the great-great-grandfather's name and date of birth was incorrect is based on speculation without citation to an alternative and conflicting last name or date of birth.

We reject father's claim that his statement to the juvenile court that his mother once told him he might have Indian ancestry provided a reason to know that the child was an Indian child. At most, father's statement suggested the possibility that the child may have Indian ancestry. Indian ancestry, however, is not among the six enumerated statutory criteria for determining whether there is a reason to know a child is an Indian child. (§ 224.2, subd. (d)(1)–(6).) "[V]ague information or ' "family lore" ' indicating a child ' "may" ' have Indian ancestry [is] insufficient to" establish a statutory reason to know the child is Indian. (*In re A.M.*, *supra*, 47 Cal.App.5th at p. 322.) ICWA notice is required only if after initial and further inquiries there is "reason to know" that an Indian

child is involved in the proceeding. (§ 224.2, subd. (f).) Any insufficiencies regarding father's claim of unknown Indian ancestry in the notices sent, therefore, were legally irrelevant. Accordingly, we conclude the juvenile court did not err in finding ICWA did not apply to the child and affirm.

## DISPOSITION

The order appealed from is affirmed.